**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

K.R., a minor, by and through his parent and natural guardian, Kali Proctor,
G.H., a minor, by and through her parent and natural guardian, Katelyn Hansen,
P.K., a minor, by and through his parent and natural guardian, Roynetter Birgans,
L.G., a minor, by and through her parent and natural guardian, Desmond Gilbert

Plaintiffs,

v.

Duluth Public Schools Academy d/b/a Duluth Edison Charter Schools,

Defendant.

Case No. 19-cv-00999 (DFW / LIB)

**FIRST AMENDED COMPLAINT (JURY TRIAL DEMANDED)**

---

Plaintiffs, by and through their attorneys, bring this action against Defendant Duluth Public Schools Academy d/b/a Duluth Edison Charter Schools ("Defendant" or "DECS"):

**PRELIMINARY STATEMENT**

1. This is a civil rights case brought by four current and former students of Defendant who, as students of color, have experienced pervasive race discrimination and harassment at DECS by both staff and students.[1]

2. All four of these elementary and middle school-aged Plaintiffs were regularly subjected to racial taunting and physical assaults at DECS, whether they attended school

---

[1] Plaintiffs are African American or biracial. For ease of reference, the Amended Complaint sometimes refers to African American and biracial students as "students of color."

at DECS's Raleigh or North Star campuses.

3. In fact, race discrimination and harassment run rampant and unchecked throughout DECS. For example, while at school, students of color are often called "Nigger" or other racial slurs by their Caucasian peers, and staff who hear this do nothing meaningful to stop it. Some Plaintiffs have also been called "Negro" or "monkey," were taunted for their "fro," were told they "look like what's inside a toilet," or were denigrated by Caucasian students saying, "At least I'm not black."

4. In addition, many students of color, including all four Plaintiffs, have been physically assaulted at school because of their race, but their Caucasian attackers faced little or no consequences. For example, Plaintiffs have been bitten, punched, kicked, pinched and/or spit on by their Caucasian peers. DECS staff have also assaulted some Plaintiffs; a teacher forcibly grabbed one Plaintiff by his face and another teacher cut off a Plaintiff's dreadlock without permission and threw it in the garbage.

5. These racially hostile acts occurred on school grounds, on school buses, and during school hours. Plaintiffs and/or their parents reported most of these incidents of racial harassment to school officials, including teachers, counselors, and administrators. Some of these incidents also occurred in plain view of school officials and employees.

6. Despite knowing about the race discrimination and harassment that Plaintiffs and other students of color regularly suffer at school and on school buses, DECS has not taken meaningful steps to stop the harassment and ensure their safety. When students of color or their parents report these incidents to DECS's leadership, DECS typically turns a blind eye; parents' phone calls and emails about the children's troubling treatment are often

ignored.

7. DECS also ignored complaints of race discrimination made by one of its African-American Cultural Liaisons, Chrystal Gardner. Ms. Gardner was a strong advocate for students of color, including Plaintiffs, but was fired after repeatedly complaining to DECS's leadership about racial harassment and race discrimination.

8. Defendant's lack of meaningful action to address racial harassment is consistent with the racially hostile culture that DECS has allowed to permeate its two schools.

9. Indeed, DECS promotes a racially hostile culture in its schools by not only ignoring racial harassment but disproportionately disciplining students of color compared to their Caucasian peers. For example, African-American students comprise 2.4% and 2.6% of the population at DECS's Raleigh and North Star locations, respectively, but account for 23.5% and 12.9% of in-school suspensions at the two locations.

10. DECS also "writes up" students of color for discipline (also known as "referrals") at a higher rate than Caucasian students. Students of color are often written up for defending themselves against Caucasian students who are engaging in racial harassment, while their Caucasian peers often receive little or no punishment at all.

11. These disciplinary referrals are placed in a cumulative file and follow students throughout their educational experience and to other schools they may later attend.

12. DECS tends to give Caucasian students more second chances when engaging in inappropriate—even discriminatory—conduct. DECS also tends to give Caucasian students more informal discipline rather than referrals that end up in their cumulative file.

13. The racially hostile environment within DECS is severe and pervasive, has affected students of color from kindergarten to eighth grade, and has caused physical and lasting psychological injuries. For example, one Plaintiff—a first grader who was repeatedly subjected to racial harassment—complained that he wanted to kill himself because he was made to "feel different" by the students and staff at DECS based on his race. DECS staff learned of the Plaintiff's concerns, but failed to notify his mother in a timely fashion or take other appropriate steps to address the crisis.

14. DECS has acted with deliberate indifference to the rampant race discrimination and harassment endured by Plaintiffs and other classmates of color. DECS's practice of ignoring or minimizing the pervasive racial harassment—and sometimes punishing students and parents who report it—has substantially contributed to the racially hostile climate at DECS and has exacerbated the racial harassment of Plaintiffs and other students of color.

15. This lawsuit alleges violations of Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and Minnesota's Human Rights Act. Plaintiffs seek injunctive, systemic reforms to remedy the racially hostile environment at DECS, as well as damages to compensate them for the harm DECS has caused.

**JURISDICTION AND VENUE**

16. This action arises under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. § 2000d; and the Minnesota Human Rights Act (MHRA), Minn. Stat. §

363A.03 *et seq*.

17. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1334 because the matters in controversy arise under the Constitution and laws of the United States.

18. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over Defendant because Defendant is a Minnesota corporation with its principal place of operations in this state.

20. Venue is proper in this district under 28 U.S.C. § 1391 because the unlawful practices described herein have been committed in the District of Minnesota, the student records relevant to those practices are, on information and belief, maintained and administered at the offices of the DECS in the District of Minnesota, and Defendant resides in the District of Minnesota.

## PARTIES

21. K.R., a minor, by and through his parent and natural guardian Kali Proctor, attended a Duluth Edison Charter School for kindergarten, first grade, and part of second grade (2016 until approximately September 2018). Ms. Proctor is Caucasian and K.R. is bi-racial (African American and Caucasian).

22. G.H., a minor, by and through her parent and natural guardian Katelyn Hansen, attends a Duluth Edison Charter School. G.H. is currently in fifth grade and has attended Duluth Edison Charter School since kindergarten (2014 until the present). Ms. Hansen is Caucasian and G.H. is bi-racial (African American and Caucasian).

23. P.K., a minor, by and through his parent and natural guardian, Roynetter Birgans attends a Duluth Edison Charter School. P.K. is currently in seventh grade and has attended DECS since kindergarten (2012 until the present). Ms. Birgans and P.K. are both African American.

24. L.G., a minor, by and through her parent and natural guardian, Desmond Gilbert, attended a Duluth Edison Charter School for kindergarten and part of first-grade (approximately 2017 and part of 2018). Mr. Gilbert is African American and L.G. is biracial.

25. Defendant Duluth Public Schools Academy is a domestic non-profit corporation charged with overseeing and administering the two public Duluth Edison Charter School campuses. Defendant has a registered office of 3301 Technology Drive, City of Duluth, State of Minnesota.

## BACKGROUND FACTUAL ALLEGATIONS

### *History of Duluth Edison Charter Schools*

26. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth here.

27. DECS opened in or about 1997.

28. DECS is a federally-funded public charter school system located in the City of Duluth.

29. The authorizer for DECS is Innovative Quality Schools.

30. DECS has two campuses: Raleigh, which educates students in grades kindergarten through fifth, and North Star, which educates students from kindergarten

through eighth grade.

31. Raleigh is located at 5905 Raleigh Street, City of Duluth, State of Minnesota.

32. North Star is located at 3301 Technology Drive, City of Duluth, State of Minnesota.

33. North Star and Raleigh are largely racially homogenous schools.

34. According to the Office of Civil Rights most recent data collection (2015), Black/African American students only comprised 2.6% of the student population at North Star and only 2.4% of the student population at Raleigh.

35. The number of African-American and biracial students at DECS has been decreasing.

36. The DECS 2017-2018 Annual Report provides that 1399 students attended these schools. Of the 1399 students, only 4.1% were Black/African American.

37. On information and belief, during the relevant time period, the only full-time African-American staff at DECS have been two African-American Cultural Liaisons at two separate times, as well as a janitor for a short time.

38. Bonnie Jorgenson is the Head of Schools for DECS and has held this position during the relevant time period.

39. Kristin Regas is the Dean of Students for Raleigh and held this position during the relevant time period.

40. Steven Lindberg is the Dean of Students for North Star and held this position during the relevant time period.

41. Ryan Dickinson is the Assistant Dean of Students for North Star and held

this position during the relevant period.

42. Danielle Perich is the Principal for Raleigh and held this position during the relevant time period.

43. Jennifer Fuchs is the Principal for grades 6-8 at North Star and held this position during the relevant time period.

44. Tammy Rackliffe is the Primary Academy Director for grades K-2 at North Star and held this position during the relevant time period.

45. Matt Petersen is the Elementary Academy Director for North Star for grades 3-5 and held this position during the relevant time period.

46. K.R. is a former student of Raleigh.

47. G.H. currently attends Raleigh.

48. P.K. currently attends North Star.

49. L.G. is a former student of North Star.

***DECS's Policies, Practices and Customs are the Same at Both Campuses***

50. Though DECS operates two campuses, its policies, practices, and customs are the same at both.

51. Bonnie Jorgenson is the Head of Schools for both campuses.

52. The administrators at each campus report to Jorgenson.

53. There is one board of directors that governs both campuses.

54. There is one student and parent handbook for both campuses. The handbook details the applicable policies for both campuses, including the code of conduct, discipline and dispute resolution policies, as well as prohibitions against harassment, discrimination,

bullying, violation, and intimidation. The handbook alleges that "Physical or verbal violation (fighting, rough housing) will not be tolerated" and asks students to "[r]eport to an adult any dangerous or unkind behaviors that you see."

55. Chrystal Gardner, DECS's former African-American Cultural Liaison and a staff member who repeatedly complained about the racially motivated harassment experienced by Plaintiffs and others, served students at both campuses equally, and her job description listed her as an employee of DECS, not a specific campus.

***DECS has a Custom and Practice of Turning a Blind-Eye to Racist Conduct***

56. Across both of DECS's campuses, students of color regularly experience racial harassment and discrimination. The discriminatory and harassing conduct is so severe, pervasive, and objectively offensive that it has created a racially hostile climate for Plaintiffs and other students of color.

57. Despite its policies prohibiting harassment and discrimination, DECS has failed to adequately address this abhorrent behavior. DECS's deliberate indifference to the rampant racially-motivated harassment and discrimination effectively emboldens Caucasian students and staff to harass students of color at both of its schools.

58. For example, students of color at both campuses are repeatedly called "Nigger" by their Caucasian peers.

59. When students of color have expressed their discomfort with their Caucasian peers' use of the word, Caucasian students often claim they have an "N word" pass and are therefore allowed to say the word. On information and belief, DECS has not taken any meaningful action to reduce the use of racial slurs.

60. At least one time in or about the Winter of 2017, Caucasian students drew a swastika on the bus window in the presence of students of color who later complained to Chrystal Gardner.

61. Ms. Gardner reported this troubling, intimidating incident to the Dean of Students at North Star, Steve Lindberg, but Lindberg never followed up with Ms. Gardner.

62. On another occasion, an African-American student asked a Caucasian student what his screen name was, so they could play a game together during free time in math class. After the Caucasian student initially refused to tell him, the Caucasian student shouted out that his screenname was "KKK" followed by some numbers.

63. Initially, the Caucasian teacher in charge ignored the comment, but when he realized that Ms. Gardner had witnessed the incident and he saw her reaction, he ultimately requested that the Caucasian student speak with him. On information and belief, this student suffered no meaningful consequences, as he was present at school the next day.

64. DECS's administration is aware of the frequent use of hate speech and the discriminatory actions that permeate both campuses.

65. DECS faculty members have witnessed many of these incidents.

66. Parents and guardians often complain to DECS about the racial harassment and discrimination their children are experiencing at school, but their complaints go unaddressed.

67. On multiple occasions, Ms. Gardner, the former African-American Cultural Liaison, also notified DECS's administration of the ongoing racism at its schools.

68. For example, in or about the Fall of 2016, Ms. Gardner personally met with

Ms. Jorgenson and informed her that Caucasian students were calling students of color "Nigger" or "Nigga."

69. Ms. Gardner also reported that, when students of color respond to the racial aggression by their Caucasian peers, the students of color are the ones that get punished.

70. Ms. Jorgenson told Ms. Gardner she was aware of the issue and that she would look into it.

71. Ms. Jorgenson never followed-up with Ms. Gardner on these specific complaints, and to Ms. Gardner's knowledge, no meaningful steps were taken to remedy the problem.

72. In or about the Winter of 2017, Ms. Gardner drafted a letter to Ms. Jorgenson, among other staff, regarding racism within DECS's schools.

73. Ms. Gardner also met in person with Ms. Jorgenson to discuss the racial inequities she witnessed and heard about from the students. Through these communications, Ms. Gardner discussed (among other things) how students of color were peppered (referring to the small population) among the schools and treated differently based on their race. Ms. Gardner reiterated that students of color were still being called "Nigger" or "Nigga" by their Caucasian peers.

74. Despite the troubling events and reports by Ms. Gardner, neither Ms. Jorgenson nor any other administrator took meaningful action to address the race-based problems.

75. DECS abruptly terminated Ms. Gardner in June 2018. Plaintiffs were devastated that she was not allowed to return to school, as she was their advocate.

76. Students also spoke out against the racist culture at DECS themselves.

77. Fed up with school culture and DECS's lack of action, in or around April of 2018, students of color prepared and circulated a petition at school about racial aggression.

78. Students of color also organized a protest against racial injustice.

79. In May 2018, students at DECS wore all black in lieu of their student uniform and walked out of school and into the parking lot for approximately twenty-five minutes.

80. Teachers referred internally to the peaceful protest as a "riot."

81. The students' concerns were not ultimately heard and did not culminate in school sponsored actions. In contrast, Caucasian students who previously forewent wearing their uniform to protest a different school issue were invited to escalate their concerns at the next school board meeting.

***Across Both Campuses, DECS Staff Treats Students of Color and their Families in a Discriminatory Manner***

82. DECS's deliberate indifference to the rampant racial discrimination and harassment at its campuses is also expressed in the staff's lack of basic sensitivities when handling racial tensions, as well as the manner in which they interact with students of color and their families.

83. Notably, in or about the Fall of 2016, DECS received a report from the Minnesota Department of Education ("MDE") in connection with an equity study MDE had completed for DECS.

84. The report, titled "Duluth Edison Charter Schools, Cultural Climate Assessment for American Indian and African American Students," provides in part:

a. "many students reported their belief that racial taunting was a frequent experience, either in terms of their direct experience, or as witness to the experience of others."

b. "[i]n addition to the student's report of the presence of taunting or use of inappropriate language related to race, several students stated their perception that many staff did not recognize that taunting occurred, minimized taunting, or did not employ responses to taunting according to the Olweus program."

c. "several of the students who spoke about their behavior expressed their belief that given a similar behavior with a Caucasian student, they felt more likely to be singled out as being disruptive."

85. The report analyzed the cultural environment at DECS as a whole and provided one set of findings and recommendations for both campuses.

***DECS's Students of Color Experience Disproportionate and Selective Discipline***

86. At both campuses, DECS disciplines students of color at disproportionate rates in comparison to their Caucasian peers.

87. DECS also disciplines students of color more harshly.

88. Students of color are more likely to receive referrals or suspensions at DECS, whereas Caucasian students are more likely to receive verbal, undocumented warnings.

89. The Office of Civil Rights Survey data from 2015 illustrates some of these disciplinary disparities:

| The Office of Civil Rights Survey Data (Survey Year: 2015) | | |
|---|---|---|
| **School** | **% of Student Population that is Black or African American** | **% of In-School Suspensions of Black or African American Students** |
| Raleigh[2] | 2.4% | 23.5% |
| North Star Academy[3] | 2.6% | 12.9% |

90. The Office of Civil Rights data collection outcome calculator further reveals that African-American students were often far more likely than Caucasian students to receive out-of-school suspensions at both DECS campuses from 2011-2016:

| The Office of Civil Rights Survey Data<br>Out of School Suspension ("OSS") Ratio[4]<br>(X more likely Black students to receive out of school suspensions than Caucasian students) | | | |
|---|---|---|---|
| **School** | **2015-2016** | **2013-2014** | **2011-2012** |
| Raleigh | 0 | 7.60 | 6.91 |
| North Star Academy | 10.61 | 6.72 | 4.69 |

91. Pursuant to DECS's policies at both campuses, disciplinary data are placed in a cumulative file and follow students throughout their educational experience and to

---

[2] The Office of Civil Rights Data Collection, available at https://ocrdata.ed.gov/Page?t=s&eid=528184&syk=8&pid=2275 (last accessed on 4/10/2019).

[3] The Office of Civil Rights Data Collection, available at https://ocrdata.ed.gov/Page?t=s&eid=525957&syk=8&pid=2275 (last accessed on 4/10/2019).

[4] The Office of Civil Rights Data Collection Outcome Calculator Tool, available at https://ocrdata.ed.gov/DataAnalysisTools/DataSetBuilder?Report=4 (last accessed on 4/10/2019).

other schools they may later attend.

## PLAINTIFFS' FACTUAL ALLEGATIONS

***Former Student K.R. (Raleigh)***

92. While K.R. attended DECS's Raleigh campus, he regularly experienced racial harassment and discrimination by Caucasian students and staff.

93. Consistent with its policies, practices, and customs at both campuses, DECS failed to take appropriate action to remediate the discrimination and harassment and provide a safe learning environment for K.R.

94. The conduct at school got so bad that, in or about the Spring of 2017, K.R. began telling his mother he did not want to be black any more.

95. Students often made fun of how K.R. looked.

96. For example, a male Caucasian student made fun of his hair, often referring to it as a "fro."

97. Derogatory statements regarding K.R.'s race began as early as kindergarten. For example, in kindergarten K.R. was attempting to find an outside seat on the school bus to sit, and a Caucasian student, who refused to let him sit in a seat of his choice, looked at K.R. and said something to the effect of, "At least I'm not black."

98. When K.R. told the bus driver about his conflict, the bus driver simply told K.R. to find another seat. On information and belief, the bus driver's name was Jeff [Last Name Unknown].

99. Throughout his time at Raleigh, K.R. often heard students calling other students "Nigger." On information and belief, students did not suffer meaningful

consequences for using this derogatory language.

100. During the most recent Presidential election, Caucasian students at DECS told K.R. that Trump was racist.

101. When K.R. asked what that meant, they told him Trump did not like black people.

102. Thereafter, K.R. asked a teacher at Boys and Girls Club, as well as his mother, Ms. Proctor, what racism was.

103. The discrimination and harassment K.R. experienced at Raleigh got so serious that, in the first grade, K.R. said he wanted to kill himself.

104. Specifically, on or around October 25, 2017, Ms. Proctor received an email from K.R.'s teacher, Jen Ondrus, at approximately 6:23 p.m., stating that K.R. made a statement during school that day that he wanted to kill himself with a wood chip and wished that he would get kicked out of his school.

105. K.R. later told Ms. Proctor he wanted to kill himself because white students and staff at DECS made him "feel different" and didn't like black people.

106. Despite K.R.'s alarming statements, Ms. Ondrus sent K.R. to his art class, where his art teacher confirmed that K.R. seemed "off" and had laid on the carpet in class and refused to participate.

107. Despite the serious nature of K.R.'s behavior, DECS did not call Ms. Proctor, instead waiting until well after school ended to notify her via email. At that point, K.R. had already left school and was put on a bus to go to an after-school program.

108. After K.R. declared he wanted to kill himself, Ms. Ondrus told K.R.

something to the effect that K.R. "needed to work through these things."

109. As a crisis responder herself, Ms. Proctor was extremely upset that the school deliberately chose not to notify her regarding K.R.'s statement until later that evening.

110. On or about November 8, 2017, Ms. Proctor emailed Ms. Ondrus in regard to how stressed K.R. was about school, saying "he hates school and is refusing to go." She further discussed her concerns in an in-person conference with Ms. Ondrus.

111. Ms. Proctor believed the school was not taking any responsibility for her discrimination concerns, and instead, put it all on Ms. Gardner to fix.

112. The school did not take any meaningful steps to find a resolution to these issues.

113. On or about December 17, 2017, K.R. was bitten in the ear by a Caucasian student. Ms. Proctor only learned of the physical assault from communications with her son, who was in first grade at the time.

114. On information and belief, the Caucasian student who bit K.R. did not suffer any meaningful consequences.

115. K.R. also experienced a physical assault by his teacher.

116. Specifically, on or about April 11, 2018, K.R. was talking with a Caucasian female classmate while waiting in line for the bus. The classmate took a card that K.R. had made for his mom, and when he tried to get it back, Ms. Ondrus grabbed him by the chin in front of his classmates, turned his face towards her, and said something to the effect of "fix it child" and "does it look like she is enjoying that?"

117. K.R. was very upset and told Ms. Proctor when he returned home that day

that Ms. Ondrus had grabbed him. Additionally, he was humiliated by this altercation as it happened before all of his peers.

118. Ms. Proctor called Bonnie Jorgenson and left a voicemail, but she did not receive a call back.

119. On April 12, 2018, Ms. Proctor emailed Ms. Ondrus explaining that K.R. reported that Ms. Ondrus grabbed him by the face.

120. That same day, Ms. Ondrus emailed Ms. Proctor and failed to expressly address anything about the physical altercation that K.R. had reported.

121. Ms. Proctor ultimately had an in-person meeting with Kristin Regas, an administrator at Raleigh, who was angry at Proctor for reaching out to Ms. Jorgenson regarding the incident.

122. Ms. Regas said something to the effect of "I am not really sure what you are hoping to come of this meeting."

123. The only solution Ms. Regas proposed was to move K.R. into another classroom, disrupting his learning and removing him from his friends. There was no discussion of reprimanding the teacher who physically grabbed him.

124. Ms. Proctor asked Ms. Regas if she was going to report the incident in light of her mandatory reporting obligations, but Ms. Regas said no.

125. Ms. Proctor reiterated her mandatory reporting obligations, to which Ms. Regas said something to the effect of "Thanks for telling me how to do my job."

126. Ms. Proctor was at a loss and crying during this meeting due to the school's utter disregard for the serious nature of the situation and its unwillingness to find a

meaningful solution for her son.

127. Ms. Proctor also spoke with Ms. Ondrus about the incident, but Ms. Ondrus denied grabbing K.R.'s face.

128. Ms. Ondrus did admit that she did not talk to the female Caucasian student involved to get the other side of the story nor did she punish the Caucasian student.

129. Despite notifying the school of these serious events, once again, DECS took no meaningful steps to address the situation or provide for a safe learning environment for K.R.

130. In addition to the physical and verbal assaults K.R. suffered while attending DECS, he also was not provided proper care regarding medications he was supposed to receive during the school day.

131. Specifically, K.R. suffers from asthma and had a 504 asthma action plan on file that was often not followed by DECS staff.

132. On multiple occasions, the nurse did not administer K.R.'s medication, blaming it on K.R. because he did not come down to her office.

133. Additionally, K.R. had food allergies that the school did not take seriously.

134. One on occasion, the DECS food services staff emailed Ms. Proctor after feeding K.R. foods he was allergic too, explaining that it was challenging for her and the staff as they were having to read labels on what they were serving.

135. At one point, Ms. Proctor called the public health nurse and asked her if it was possible the reason K.R. was not being cared for had anything to do with his race. The public health nurse acknowledged that systematic racism absolutely occurs.

136. Ms. Proctor also attempted to reach out to Bonnie Jorgenson to discuss air quality assessments at Raleigh given the health issues her son was experiencing at school related to his asthma.

137. Ms. Jorgenson told Ms. Proctor she would be in touch but never followed up with her.

138. Out of fear for her child's safety and well-being, Ms. Proctor removed K.R. from DECS schools in September 2018.

139. K.R. now attends Stowe elementary.

140. K.R. told Ms. Proctor something to the effect of, "I love my teacher at Stowe because she looks in the eyes of blacks kids just like she does the Caucasian kids."

141. As a result of the pervasive racial discrimination and harassment K.R. experienced, and DECS's failure to address it appropriately, K.R. suffered physical, psychological, and emotional harm.

***Student G.H. (Raleigh)***

142. Since matriculating at DECS's Raleigh campus, G.H. has regularly been subjected to racial harassment and discrimination by Caucasian students, staff, and administrators.

143. Consistent with its policies, practices, and customs at both campuses, DECS has failed to take appropriate action to remediate the discrimination and harassment and provide a safe learning environment for G.H.

144. At Raleigh, Caucasian students have hurled racially derogatory slurs at G.H. and, on information and belief, suffered no meaningful consequences.

145. A Caucasian male told G.H. and a biracial friend something to the effect of, "You look like what's inside a toilet." When G.H. responded, "You look like the toilet," she was punished and, to her knowledge, he wasn't.

146. Another Caucasian student told G.H. she looked like a monkey.

147. Multiple Caucasian students called G.H. a "Negro" after reading a book for Martin Luther King Day. G.H. asked them to stop, but they persisted.

148. G.H. has also heard Caucasian students call other students of color "Negros" in the classroom and the lunchroom.

149. G.H. has told her teachers about students using this language, but they did nothing to make it stop.

150. Due to DECS's failure to take meaningful action to stop the harassment, the discriminatory conduct directed at G.H. began to escalate in the fall of 2018.

151. During the fall of 2018, G.H. and a Caucasian female student had an argument over a boy they both expressed interest in, resulting in both students engaging in name calling.

152. Ms. Hansen, G.H.'s mother, had a meeting on or about October 12, 2018, with Dean Regas and DECS teacher, Erin Vatne, about the conflict between the two girls.

153. Ms. Regas insisted G.H. attend the meeting with the other adults, despite Ms. Hansen's request that G.H. be able to wait outside.

154. During this meeting, Ms. Regas told Ms. Hansen something to the effect of "[DECS] is a by choice school", suggesting that she could pull G.H. out of the school if she did not agree with the way DECS handled the situation.

155. G.H. began to cry during the meeting and explained that she was not bullying and that she and the other student were both saying things to one another.

156. DECS ultimately gave G.H. a three-day suspension (one day in-school suspension, and a two-day out of school suspension) for her part in the dispute with the Caucasian female student.

157. On information and belief, the Caucasian female student did not receive a similar punishment, despite the fact that she also participated in name-calling.

158. Further, this punishment exceeds the stated minimum disciplinary recommendation for a first bullying offense, as outlined in the DECS Student Handbook.

159. At no time prior to the in-school suspension did Ms. Regas communicate that G.H. was given an in-school suspension (ISS). Instead, Ms. Regas told Ms. Hansen that G.H. would be placed in another classroom while student interviews were being conducted regarding the girls' conflict.

160. Ms. Regas admitted she failed to tell Ms. Hansen that G.H. was given an ISS.

161. Further, Ms. Regas admittedly failed to provide Ms. Hansen with the Pupil Fair Dismissal Act notice in a timely manner.

162. Instead, Ms. Regas gave a copy to G.H.'s younger sister, a third-grader, who also attends Raleigh and left it to a minor child to give to Ms. Hansen.

163. Ms. Hansen subsequently met with Bonnie Jorgenson and Danielle Perich on or about October 16, 2018 and told them that she believed her daughter G.H. was being discriminated against on the basis of race because of the way the school was treating her in contrast with the other student, and Ms. Hansen further stated that she thought the school

was not culturally competent.

164. Ms. Hansen further accused DECS of disproportionally disciplining African-American students as compared to Caucasian students.

165. For example, in or about September 2018, a Caucasian male student made a face at G.H., and she in turn made a face back at him.

166. Thereafter, the male student walked up to G.H. and spit on her clothes and face. The spitting was so extreme that G.H. had to change her clothes at school.

167. The Caucasian student did not suffer any meaningful consequences.

168. DECS failed to write an incident report and it was not documented until Ms. Hansen pressed Ms. Regas to remedy the deficiency.

169. G.H. was told by DECS staff that she needed to ignore his funny faces because this particular student allegedly had "anger issues."

170. When Ms. Hansen picked up G.H. from school, Ms. Regas also told her that the student who had spit on G.H. had "anger issues," ostensibly in an effort to excuse what happened to G.H.

171. On or about October 25, 2018, Ms. Hansen received an email from Ms. Jorgenson, stating that she had concluded no discrimination occurred.

172. Shortly after making a complaint of discrimination, Ms. Hansen was notified by DECS that they had allegedly received a complaint from a parent stating that G.H. had bullied her daughter.

173. Curiously, the complaint was in connection with the same Caucasian female student G.H previously had a conflict with about a boy in their class and related to the same

incident that had resulted in a three-day suspension for G.H.

174. Thereafter, on November 7, 2018, Ms. Hansen told Ms. Jorgenson she was not satisfied with the conclusion of her purported investigation relating to her discrimination complaint and requested DECS hire an outside investigator.

175. Ms. Jorgensen notified Ms. Hansen that, while DECS agreed to hire an outside investigator to investigate the allegations of discrimination against Ms. Regas, the school insisted on concurrently investigating G.H. for alleged bullying of the other student.

176. Ms. Hansen was puzzled as to what the basis was for her daughter's subsequent investigation since G.H. had already been punished for the conflict with her Caucasian female classmate.

177. Further, it was Ms. Hansen's understanding that the girls had apologized to one another and moved forward.

178. Ms. Hansen made multiple requests to Ms. Jorgenson for more details as to why her daughter was suddenly being investigated again but to no avail.

179. On November 8, 2018, Ms. Hansen sent another request to Ms. Jorgenson for more information about the allegations against her daughter to which Ms. Jorgenson stated: "Per the advisement of our lawyer, the information we are allowed to legally share will come from the outside investigator."

180. On November 15 and November 16, 2018, Ms. Hansen and G.H. voluntarily participated in an investigatory interview with Linda Chung, the outside investigator hired by DECS, despite not being provided the basis for the investigation into G.H.'s behavior.

181. During the interview, Ms. Hansen again requested to know the basis for the

investigation into her daughter's behavior, but Ms. Chung told her that the information she received must come from the school, contrary to what Ms. Jorgenson previously communicated to Ms. Hansen.

182. Following Ms. Hansen and G.H.'s participation in the investigatory interview, G.H. received two more disciplinary referrals.

183. Notably, in Quarter Two (approximately October 26, 2018 to January 10, 2019), G.H. received approximately 19 referrals from DECS.

184. One of her referrals was given to G.H. after she was not permitted to sit on a chair and responded to the teacher with something to the effect of "I feel like all the white kids can sit on the chair."

185. On December 12, 2018, Ms. Jorgenson sent Ms. Hansen the results of the outside investigation.

186. Ms. Jorgenson stated that—while Ms. Regas admittedly failed to follow DECS procedures regarding student discipline against the Caucasian student who spit on G.H., and further, failed to follow procedures related to the ISS—the failure to follow said procedures was not due to racial bias.

187. Alternatively, Ms. Jorgenson stated that DECS was suspending G.H. for two more days as a result of the alleged bullying behavior. This was the second round of suspensions G.H. received for the same incident.

188. On December 17, 2018, Ms. Hansen reported to Ms. Jorgensen that G.H. was being bullied again by another female Caucasian student.

189. Three days later on December 20, 2018, Danielle Perich concluded there was

no evidence to corroborate G.H.'s allegations of bullying.

190. On or about January 17, 2019, DECS promoted a "free dress day" for students who had not received referrals. In other words, students who had no referrals did not have to wear their school uniforms whereas students with referrals did.

191. Ms. Hansen emailed Danielle Perich explaining that this celebration was "very unethical and just flat out not right."

192. Ms. Hansen further explained that not only were kids singled out, but that these kids were also publicly shamed for an entire day in front of the whole school.

193. Additionally, the kids who were not allowed to wear free dress had already received consequences for their actions, and Ms. Hansen questioned why they should receive this additional consequence.

194. On February 14, 2019, Ms. Jorgenson emailed Ms. Hansen, explaining that, while she did not believe that the school violated state or federal law through the free dress day, the school did not plan to handle dress days like that again.

195. DECS continues to give G.H. discriminatory referrals and treat her unequally as compared to her Caucasian peers.

196. Ms. Hansen has also reached out to Sean Moore, the school's current African-American liaison, in connection with her discrimination concerns pertaining to G.H.

197. On January 10, 2019, Mr. Moore emailed Ms. Hansen, stating in part: "I fear [G.H.] is developing a reputation that speaks poorly of her true nature and I fear even worse she is developing in the minds of some an unkind expectations of girls of color."

198. As a result of the pervasive racial discrimination and harassment G.H. has experienced, and DECS's failure to address it appropriately, G.H. has suffered physical, psychological, and emotional harm. Among other things, G.H. has had nightmares about school and feels like she cannot trust anyone.

199. Notably, this is not the first time Ms. Hansen and her family have been retaliated against in connection with complaints about race discrimination.

200. Ms. Hansen's son, R.K., also attended Raleigh from first through fifth grade, and North Star for sixth and seventh grade. R.K. is also bi-racial (Caucasian and African American).

201. Ms. Hansen noticed that her son and other students of color were disproportionally given referrals on the bus as compared to Caucasian peers.

202. Ms. Hansen requested Ms. Regas and Ms. Perich provide her with information regarding the proportion of Caucasian students being written up as compared to their African-American counterparts at DECS.

203. Ms. Hansen was never provided with the requested information.

204. Instead, DECS reported Ms. Hansen to Child Protection Services for allegedly neglecting her son because he was sleeping too much in school.

205. Notably, her son's Individual Education Plan (IEP) allowed for him to take a nap at school because of sleep issues he was having at night and in an effort have a more productive school day overall.

206. In light of the discrimination and unsafe learning environment, Ms. Hansen removed R.K. from North Star in the fall of 2018, and he now attends a school outside the

district.

207. R.K. is thriving at his new school and has not received any disciplinary referrals.

***Student P.K. (North Star)***

208. Since matriculating at DECS's North Star campus, P.K. has regularly been subjected to racial harassment and discrimination by Caucasian students and staff.

209. Consistent with its policies, practices, and customs across its campuses, DECS has failed to take appropriate action to remediate the discrimination and harassment and provide a safe learning environment for P.K.

210. P.K. is currently in seventh grade and has attended North Star since kindergarten.

211. Alicia Mattsen was P.K.'s sixth grade teacher and remains his teacher for the seventh grade.

212. During his time at North Star, P.K. has heard students call one another "Nigger" in common school areas, such as the halls.

213. P.K. has been, and continues to be, harassed by Caucasian students and staff at DECS.

214. For example, P.K. was punched in the face by an eighth grade Caucasian student after P.K. unintentionally bumped into this student in the hallway. On information and belief, DECS did not reprimand the Caucasian student for his actions.

215. In P.K.'s experience at DECS, students of color are disciplined more often than Caucasian students.

216. Ms. Mattsen often unduly scrutinized P.K.

217. For example, on more than one occasion, Ms. Mattsen hovered over P.K. and pointed her finger in P.K.'s face when speaking to him.

218. On information and belief, Ms. Mattsen does not do this to other students.

219. Ms. Mattsen also penalized P.K. more often than other Caucasian students.

220. On one occasion, a Caucasian female student was making an excessive amount of noise in class when P.K. was trying to focus on his work. He asked her to please stop, and Ms. Mattsen sent P.K. to the office as a result. To P.K.'s knowledge, the Caucasian female student was not punished like P.K.

221. On one occasion, P.K. was explaining to another student that he believed Caucasian students were not punished like students of color at DECS.

222. P.K.'s teacher, Ms. Mattsen, overheard P.K. and told him she was not a racist and threatened to write him up if she heard him say something like that again.

223. On or around April 19, 2018, P.K. got his glasses stuck in his dread locks on the top of his head.

224. At the time, P.K. had difficulty seeing his teacher Brook Pecharich's actions and became afraid when he realized she was coming towards him with scissors in her hand.

225. Ms. Pecharich proceeded to cut the dreadlock from P.K.'s head without warning P.K. or obtaining his consent. She then threw his hair in the garbage.

226. Ms. Pecharich told P.K. something to the effect of, "I only cut the nappy strands."

227. Afterwards, Mr. Petersen called Ms. Birgans, P.K.'s mother, and told her that

Ms. Pecharich needed to speak with her. Ms. Pecharich said something to the effect of, "I'm sorry I had to cut [P.K.'s] hair to get his glasses out."

228. Ms. Birgans heard P.K. crying in the background. Ms. Birgans was extremely upset and told Ms. Pecharich the gravity of the situation, explaining that P.K's dreadlocks are an important part of African-American culture.

229. Further, on several occasions prior to this Ms. Birgans had communicated to DECS that they should call her if anything came up with regard to her son because she could generally arrive to the school in under ten minutes.

230. Mr. Petersen and Ms. Plath tried to minimize the severity of the situation by telling Ms. Birgans that only a few strands were cut and not to worry.

231. Ms. Birgans complained to the school administration and to the police about the incident.

232. As a result, P.K. has a bald spot on the front of his head, which has further impacted his low self-esteem and spurred additional harassment by his Caucasian classmates.

233. P.K. often reached out to Chrystal Gardner, the African-American Cultural liaison, for support.

234. On one occasion, P.K. recalls asking Ms. Mattsen if he could talk to Ms. Gardner. Ms. Mattsen responded with something to the effect of, "that's what little black kids do, they whine."

235. To date, DECS has not taken any meaningful action to remediate these issues and provide a safe learning environment for P.K.

236. At birth, P.K. was diagnosed with congenital nystagmus, a condition that causes impaired vision.

237. Congenital nystagmus causes P.K.'s eyes to oscillate, and in turn, makes it difficult to see without reasonable accommodations.

238. P.K. wears prescription glasses and has a difficult time seeing text clearly if it is not large enough. P.K. generally needs the font to be between 28 to 32 font size.

239. Additionally, due to his blurry vision, it is not uncommon for P.K. to bump into objects and people inadvertently as he navigates the school grounds. Therefore, his mother requested that DECS allow him to leave each class before other students are dismissed so he can navigate the halls more safely. Additionally, a DECS staff member is supposed to accompany P.K. while he walks to and from his classes.

240. Ms. Birgans and P.K. communicated the fact that P.K. has a disability and related reasonable accommodation requests to DECS on numerous occasions.

241. In fact, in or about fifth grade, P.K., created and shared a presentation to his class about his disability.

242. During the 2017-2018 school year (sixth grade), Ms. Birgans noticed P.K. was starting to get an increasing number of behavioral referrals.

243. After discussing the increase in referrals with her son, Ms. Birgans realized P.K. was not able to see in class and that his requests for help were often labeled as behavior issues.

244. Ms. Birgans recalls meeting with the DECS social worker Dawn Plath to discuss P.K.'s referrals.

245. Ms. Birgans also met in person with Ms. Mattsen. During this meeting, Ms. Mattsen claimed she was unaware of P.K.'s disability.

246. On March 29, 2018, Dawn Plath told Ms. Birgans via email, "I do think we have failed P.K. this year. All of the referrals are just evidence that we have not figured out the best way to meet his needs . . ."

247. Ms. Birgans once again explained the condition and the reasonable accommodations P.K. needed in order to be successful at school. She further asked that the school call her right away if P.K was having any issues.

248. The next day, Ms. Birgans stopped by the school to check-in on P.K. Despite previously stating the reasonable accommodations P.K. needed, Ms. Mattsen still did not display the proper size font for P.K. As a result, P.K. was sitting in class with his head down unable to see what Ms. Mattsen was teaching.

249. At one point, Ms. Birgans recalls telling Ms. Mattsen something to the effect of, "I know you don't like my son, but teach him the way you are supposed to teach him."

250. Most recently, Ms. Birgan met with Sean Moore, the new African-American Cultural liaison at DECS, and explained that P.K.'s alleged behavior issues are actually the result of DECS's failure to accommodate his disability. She further reiterated that Ms. Mattsen treats P.K. differently and is always scrutinizing him.

251. Mr. Moore said something to the effect of "if you feel that this school is not equipped to handle P.K., then you can send him somewhere else."

252. In or about March 2019, Mr. Moore told Ms. Birgans that other parents were complaining that students of color were being neglected and that he intended to hold a

meeting. He asked Ms. Birgans if she would like to participate, and she said yes and provided him with her phone number.

253. To date, Mr. Moore has not called Ms. Birgans regarding the alleged meeting.

254. To date, DECS has not taken any meaningful action to address the discrimination and harassment P.K. has endured by Caucasian students and staff.

255. As a result of the pervasive racial discrimination and harassment P.K. has experienced, and DECS's failure to address it appropriately, P.K. has suffered physical, psychological, and emotional harm.

***Former Student L.G. (North Star)***

256. While L.G. attended DECS's North Star campus, she regularly experienced racial harassment and discrimination by Caucasian students and staff.

257. Consistent with its policies, practices, and customs at both campuses, DECS failed to take appropriate action to remediate the discrimination and harassment and provide a safe learning environment for L.G.

258. L.G. attended North Star in 2017 (kindergarten) and part of 2018 (first grade).

259. Shortly after starting school at North Star, L.G. began experiencing discrimination and harassment by Caucasian students and staff because of her race.

260. For example, in kindergarten, a white student threatened to stab L.G. in the eyes with a screwdriver because she looked "different."

261. DECS knew about the physical threat, but did not notify L.G.'s father, Mr.

Gilbert.

262. Instead, Mr. Gilbert learned about the threat from L.G. after she returned home from school upset and told him about the situation.

263. The next day, Mr. Gilbert went to North Star to meet in person with L.G.'s teacher, Ms. Ellison, and explained he was very upset about the physical threat made against his daughter.

264. Concerned for the safety of his daughter, Mr. Gilbert also asked that Ms. Ellison identify which student threatened L.G.

265. Ms. Ellison acknowledged the altercation had occurred, but refused to tell Mr. Gilbert which student threatened L.G. and whether that student would face any consequences.

266. Dissatisfied with Ms. Ellison's response, Mr. Gilbert reported the incident to two Deans of Students, Steve Lindberg and Ryan Dickinson.

267. Lindberg and Dickinson told Mr. Gilbert they would look into it, but they never followed up with a meaningful solution.

268. L.G. continued to experience verbal harassment and physical assaults throughout her tenure at North Star.

269. For example, on several occasions, the same three white students physically assaulted L.G. The assaults included pulling L.G.'s hair, pinching her, and kicking her.

270. When L.G. defended herself, Defendant gave L.G. disciplinary referrals.

271. DECS was quick to contact Mr. Gilbert when L.G. received referrals for her alleged misconduct, but DECS failed to contact Mr. Gilbert when L.G. was harassed or

hurt by other students or staff.

272. Mr. Gilbert went to North Star in person on several occasions to report and put an end to the racial harassment his daughter endured by her three white classmates, but to no avail.

273. Deans Lindberg and Dickinson began avoiding Mr. Gilbert, rebuffing his attempts to meet with them to discuss the racial harassment and discrimination his daughter was experiencing at school.

274. In fact, it got so difficult to reach the Deans that Mr. Gilbert felt he was left with no other choice but to show up at North Star in hope that he could get their attention.

275. When he could not reach the Deans, Mr. Gilbert began reporting his complaints to Administrator Tammy Rackliffe.

276. Mr. Gilbert continued to get the run around and was told the school would look into his concerns. Again, DECS did not take any meaningful action in response to his reports, and the harassment persisted.

277. Unsettled by what his daughter was experiencing and the school's disinterest in taking corrective action, Mr. Gilbert continued to visit and volunteer at North Star during school hours as often as he could, to ensure his daughter was safe.

278. When he could not be present, Mr. Gilbert directed L.G. to reach out to the school's then-African American Liaison, Chrystal Gardner, if she needed help during the school day.

279. Mr. Gilbert also signed L.G. up to participate in Ms. Gardner's African American student group.

280. Without Mr. Gilbert's permission, Ms. Rackcliffe removed L.G. from Ms. Gardner's care and placed L.G. with a white teacher. On information and belief, this was an effort to prevent L.G. from associating with Ms. Gardner, who had been advocating on behalf of students of color.

281. Despite Mr. Gilbert's reports of race discrimination and the school's notice of such conduct, the harassment continued.

282. For example, while riding the bus to school, an older white student punched L.G. so hard that she had a visible bruise on her rib.

283. Defendant knew about the physical assault and allegedly applied an ice pack on the injury when L.G. arrived at school, but Defendant did not notify Mr. Gilbert about the assault.

284. After L.G. told Mr. Gilbert she had been punched, Mr. Gilbert went to the school again and reported the incident to Dean Lindberg.

285. To Mr. Gilbert's knowledge, the white student did not suffer a meaningful consequence for assaulting his daughter.

286. Equally troubling, a white staff member singled L.G. out for mistreatment.

287. On at least two occasions, L.G. came home from school with her undershirt missing from underneath her uniform shirt. L.G. told her father that her music teacher, "Ms. K", took her to the bathroom, made her take her clothes off, and made her remove her undershirt because it was not part of her uniform.

288. On information and belief, L.G.'s white peers were not similarly required to disrobe and remove their undershirts.

289. After L.G. told Mr. Gilbert about these incidents, he immediately reached out to Bonnie Jorgenson, but was unable to reach her.

290. Mr. Gilbert then went to North Star and reported Ms. K's conduct to Ms. Rackliffe.

291. Ms. Rackcliffe reluctantly set up a meeting with Mr. Gilbert and Ms. K, at Mr. Gilbert's request, but Ms. K did not show up.

292. Mr. Gilbert was enormously troubled by the fact that his daughter was instructed to disrobe in a bathroom without his permission and no other individuals present, and even more so that DECS showed no interest in investigating the allegations or remedying the problem.

293. L.G. began telling Mr. Gilbert she no longer wanted to go to school and especially disliked going to her music class with Ms. K.

294. At one point, L.G. told Mr. Gilbert that she would rather be in trouble than go to music class.

295. L.G. even drew a picture of what appeared to be her crying in the corner of the music class and the rest of the students and Ms. K in a group laughing at her.

296. DECS failed to provide a safe learning environment for L.G. and ignored Mr. Gilbert's reports of racial harassment and discrimination. DECS also retaliated against L.G. and her father because of his repeated reports of harassment and discrimination, reporting Mr. Gilbert to Child Protective Services ("CPS") multiple times without a valid basis.

297. The final time CPS contacted Mr. Gilbert, they said something to the effect of, "We know nothing is wrong. I'm not sure why the school keeps calling us."

298. Because of the pervasive race discrimination and retaliation, Mr. Gilbert removed L.G. from DECS in the Fall of 2018 and transferred her to a school outside the district.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983
### (*All Plaintiffs – Denial of Equal Protection, Race Discrimination and Failure to Train)*

299. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

300. Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs have the right to equal access to an educational environment free from harassment and discrimination on the basis of race.

301. At all relevant times, DECS had unconstitutional customs, policies, or practices of (a) failing to appropriately investigate and respond to reports of racial harassment and discrimination, including reports by Plaintiffs and their families; (b) failing to enforce its policies prohibiting discrimination and harassment when victims are students of color; and (c) failing to adequately train DECS administrators and employees on how to recognize, address, and prevent racial harassment and discrimination against its students.

302. DECS followed these unconstitutional customs, policies and practices not only with regard to Plaintiffs, but also with regard to racial harassment of other students of color at both of its schools.

303. DECS's unconstitutional customs, policies, or practices constituted disparate

treatment of students of color based on their race, in violation of the Equal Protection Clause.

304. DECS's customs, policies, and practices for responding to reports of racial harassment and discrimination, including Plaintiffs' reports, were so clearly inadequate that they give rise to a reasonable inference that DECS consciously acquiesced in the harassment and discrimination.

305. DECS violated Plaintiffs' right to equal protection of the laws on the basis of their race by acting with deliberate indifference to Plaintiffs' reports of racial harassment and discrimination, as well as to the racially hostile education environment Plaintiffs suffered because of DECS's failure to take meaningful corrective action. DECS's deliberate indifference included, without limitation:

a. Ignoring or minimizing racial slurs repeatedly used by white students against students of color, including Plaintiffs;

b. Refusing to take meaningful action to address reports of race-based physical assaults against students of color, including Plaintiffs;

c. Disciplining students of color, including G.H., more frequently and more harshly than their Caucasian peers;

d. Disproportionately giving "referrals" to students of color, including G.H., in comparison to their Caucasian peers;

e. Ignoring reports of racial harassment and discrimination made by DECS's African American Cultural Liaison on behalf of students of color, including Plaintiffs;

f. Creating a hostile educational climate that tolerates racial harassment and discrimination, including bodily harm to Plaintiffs and other students of color;

g. Failing to appropriately discipline Caucasian students and staff who subjected Plaintiffs and other students of color to racial harassment or discrimination;

h. Failing to take meaningful action to correct the conditions causing the racial harassment and discrimination and to prevent its recurrence; and

i. Failing to provide adequate training for its administrators and employees to prevent and address racial harassment and discrimination despite having notice that its procedures were inadequate and resulting in a violation of Plaintiffs' constitutional rights.

306. Defendant's actions and decisions have deprived Plaintiffs of the privileges and immunities secured by the U.S. Constitution and laws, in violation of 42 U.S.C. § 1983.

307. As a direct and proximate result of Defendant's violation of Plaintiffs' equal protection rights under the Fourteenth Amendment, Plaintiffs have suffered and continue to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

308. As a result of Defendant's equal protection violation, Plaintiffs are also entitled to their attorneys' fees and costs.

**COUNT II**
**Title VI, 42 U.S.C. § 2000d**
**(*All Plaintiffs – Race Discrimination*)**

309. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

310. 42 U.S.C. § 2000d, commonly referred to as Title VI, and its implementing regulations, prohibit discrimination in a federally-funded school on the basis of a student's race.

311. Specifically, 42 U.S.C. § 2000d provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

312. Defendant is a recipient of federal funds.

313. Plaintiffs were subjected to harassment, discrimination, and disparate treatment on the basis of their race.

314. Defendant had actual notice of the racial harassment and discrimination Plaintiffs experienced at its Raleigh and North Star campuses. Plaintiffs and their families, as well as DECS's African American Cultural Liaison, reported numerous incidents to DECS's administration. In addition, some of the incidents were observed by DECS staff. DECS failed to take meaningful action to address the incidents or prevent the recurrence of racial harassment and discrimination. Instead, DECS allowed the behavior to continue and permeate its schools, creating a racially hostile culture for Plaintiffs and other students of color.

315. All of the Plaintiffs have experienced severe and pervasive racial harassment and discrimination, including verbal harassment and physical assaults. This racially hostile environment has deprived Plaintiff of educational opportunities and benefits, denying them equal access to their school's resources and opportunities, disrupting their education, and causing psychological trauma and physical harm.

316. DECS violated Title VI by acting with deliberate indifference to Plaintiffs' reports of racial harassment and discrimination, as well as to the racially hostile education environment Plaintiffs suffered because of DECS's failure to take meaningful corrective action. DECS's deliberate indifference included, without limitation:

a. Ignoring or minimizing racial slurs repeatedly used by white students against students of color, including Plaintiffs;

b. Refusing to take meaningful action to address reports of race-based physical assaults against students of color, including Plaintiffs;

c. Disciplining students of color, including G.H., more frequently and more harshly than their Caucasian peers;

d. Disproportionately giving "referrals" to students of color, including G.H., in comparison to their Caucasian peers;

e. Ignoring reports of racial harassment and discrimination made by DECS's African American Cultural Liaison on behalf of students of color, including Plaintiffs;

f. Creating a hostile educational climate that tolerates racial harassment and discrimination, including bodily harm to Plaintiffs and other students of

color;

g. Failing to appropriately discipline Caucasian students and staff who subjected Plaintiffs and other students of color to racial harassment or discrimination;

h. Failing to take meaningful action to correct the conditions causing the racial harassment and discrimination and to prevent its recurrence; and

i. Failing to provide adequate training for its administrators and employees to prevent and address racial harassment and discrimination.

317. As a direct and proximate result of Defendant's violation of Plaintiffs' rights under Title VI, Plaintiffs have suffered and continue to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

318. As a result of Defendant's violation of Title VI, Plaintiffs are also entitled to their attorneys' fees and costs.

**COUNT III**
**Minnesota Human Rights Act, Minn. Stat. § 363a.13**
**(*All Plaintiffs – Race Discrimination*)**

319. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

320. Under the MHRA, "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race…."

Minn. Stat. Ann. § 363A.13.

321. As such, Defendant had a duty to provide Plaintiffs with an educational atmosphere free of race discrimination.

322. Defendant failed to take adequate steps to provide Plaintiffs with an educational atmosphere free of race discrimination.

323. As a result of Defendant's conduct, customs, policies, and practices, Plaintiffs were unjustly and discriminatorily deprived of equal education opportunities and benefits.

324. As a direct and proximate result of Defendant's violation of Plaintiffs' rights under the MHRA, Plaintiffs have suffered and continue to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages

325. As a result of Defendant's violation, Plaintiffs are also entitled to their attorneys' fees and costs.

**COUNT IV**
**Title VI, 42 U.S.C. § 2000d**
**(*Retaliation – Plaintiff G.H.*)**

326. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

327. Defendant intentionally retaliated against Plaintiff G.H. for exercising her rights as protected under the law.

328. Plaintiff G.H. and her mother, Ms. Hansen, opposed race discrimination by

DECS.

329. Because of their reports to DECS and opposition to discrimination, including participation in an investigation, G.H. received additional referrals by DECS and was suspended.

330. As a direct result of the actions and conduct of Defendant, Plaintiff G.H. suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

331. As a result of Defendant's violation, Plaintiff G.H. is also entitled to her attorneys' fees and costs.

**COUNT V**
**Minnesota Human Rights Act Reprisal, Minn. Stat. § 363A.15**
**(*Reprisal – Plaintiff G.H.*)**

332. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

333. Minn. Stat. § 363A.15 provides that it "is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a[n] … educational institution… to intentionally engage in any reprisal against any person because that person:

> (1) opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter; or
>
> (2) associated with a person or group of persons who are disabled or who are of different race, color, creed, religion, sexual orientation, or national origin."

334. A reprisal includes, but is not limited to, "any form of intimidation,

retaliation, or harassment." Minn. Stat. § 363A.15.

335. Plaintiff G.H. and her mother, Ms. Hansen, opposed race discrimination by DECS.

336. Because of their reports and opposition to discrimination, including participation in an investigation, G.H. received additional referrals by DECS and was suspended.

337. As a direct and proximate result of Defendant's violation of Plaintiff G.H.'s rights under the MHRA, Plaintiff G.H. has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

338. As a result of Defendant's violation, Plaintiff G.H. is also entitled to her attorneys' fees and costs.

**COUNT VI**
**Title VI, 42 U.S.C. § 2000d**
**(*Retaliation – Plaintiff L.G.*)**

339. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

340. Defendant intentionally retaliated against Plaintiff L.G. for exercising her rights as protected under the law.

341. Plaintiff L.G. and her father, Mr. Gilbert, opposed race discrimination by DECS.

342. Because of their reports to DECS and opposition to discrimination, DECS

called CPS on Mr. Gilbert and L.G. multiple times.

343. As a direct and proximate result of Defendant's violation of Plaintiff L.G. rights under Title VI, Plaintiff L.G. has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

344. As a result of Defendant's violation, Plaintiff L.G. is also entitled to her attorneys' fees and costs.

**COUNT VII**
**Minnesota Human Rights Act Reprisal, Minn. Stat. § 363A.15**
**(*Reprisal – Plaintiff L.G.*)**

345. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth here.

346. Minn. Stat. § 363A.15 provides that it "is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a[n] … educational institution… to intentionally engage in any reprisal against any person because that person:

> (3) opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter; or
>
> (4) associated with a person or group of persons who are disabled or who are of different race, color, creed, religion, sexual orientation, or national origin."

347. A reprisal includes, but is not limited to, "any form of intimidation, retaliation, or harassment." Minn. Stat. § 363A.15.

348. Plaintiff L.G. and her father, Mr. Gilbert, opposed race discrimination by

DECS.

349. Because of their reports and opposition to discrimination, DECS called CPS on Mr. Gilbert and L.G. on multiple occasions.

350. As a direct and proximate result of Defendant's violation of Plaintiff L.G.'s rights under the MHRA, Plaintiff L.G. has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

351. As a result of Defendant's violation, Plaintiff L.G. is also entitled to her attorneys' fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request relief as follows:

A. For an Order adjudging the practices of Defendant complained of herein to be in violation of the rights guaranteed to Plaintiffs under federal and Minnesota law;

B. Issue a permanent injunction that directs Defendant to comply with federal and Minnesota law;

C. Leave to add additional plaintiffs or claims by motion or any other method approved by the Court including disability discrimination claims and class claims for disparate discipline;

D. For an award to Plaintiffs against Defendant of all relief available under 42 U.S.C. § 1983, 42 U.S.C. § 2000d, and the Minnesota Human Rights Act, § 363A.01 *et seq*., in amounts to be determined at trial, with interest on such amounts;

E. For an award of compensatory damages to each Plaintiff, in an amount to be determined at trial, for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, loss of educational

opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of Defendant;

F. For an award of punitive damages to the extent permitted by law in an amount to be determined at trial;

G. For an award to Plaintiffs of their attorney's fees, disbursements, and the costs of this action, and;

H. For such other and further relief as the Court deems just and equitable.

Dated: June 11, 2019

**NICHOLS KASTER, PLLP**

s/Rebekah L. Bailey
Matthew H. Morgan, MN Bar No. 304657
Rebekah L. Bailey, MN Bar No. 0389599
Anna P. Prakash, MN Bar No. 0351362
Robert L. Schug, MN Bar No. 0387013
Charlie Delbridge, MN Bar No. 0386639
Lucas J. Kaster, MN Bar No. 396251
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone (612) 256-3200
Fax (612) 338-4878
morgan@nka.com
bailey@nka.com
aprakash@nka.com
schug@nka.com
cdelbridge@nka.com
lkaster@nka.com

**PUBLIC JUSTICE, P.C.**

s/Adele P. Kimmel
Adele P. Kimmel, *pro hac vice* application pending
1620 L Street NW
Suite 630
Washington, DC 20036
Telephone (202) 797-8600
Fax (202) 232-7203

akimmel@publicjustice.net

**ATTORNEYS FOR PLAINTIFFS**